UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION


JEAN COPPEDGE, an individual,

                Plaintiff,

     v.

CITY OF HILLSBORO, a municipality, JAMES
SCHOEFFLER in his individual capacity, and
CLINT CHRZ in his individual capacity,

             Defendants.

Case No. 3:21-CV-00146-YY

FINDINGS AND
RECOMMENDATIONS

YOU, Magistrate Judge.

      Plaintiff Jean Coppedge brings this action against defendants City of Hillsboro ("City"),

Officer James Schoeffler, and Sergeant Clint Chrz, asserting state law claims against the City for

common-law negligence and race-based and disability-based discrimination in violation of the

Oregon Public Accommodations Act (OPAA), and a federal claim pursuant to 42 U.S.C. § 1983

against all defendants. Third Am. Compl., ECF 19. This court has federal question jurisdiction

over the § 1983 claim and supplemental jurisdiction over the state law claims. *See* 28 U.S.C. §

1331, 28 U.S.C. § 1367.

      Defendants have filed a motion to dismiss all of plaintiff's claims. ECF 22. For the

reasons discussed below, defendants' motion to dismiss should be GRANTED as to plaintiff's

1 – FINDINGS AND RECOMMENDATIONS

common law negligence claims and her § 1983 claim related to injuries associated with an increased threat of harm from her neighbors.  Defendants' motion should be DENIED as to plaintiff's race-based discrimination claim under the OPAA and her § 1983 claim regarding eviction-related injuries associated with a state-created danger.  Plaintiff also should be granted leave to amend her disability-based discrimination claim under the OPAA in accordance with these Findings and Recommendations, and defendants' motion to dismiss as to that claim should be DENIED.

**FINDINGS**

I.     **Background Facts and Procedural History**

Plaintiff is a 70-year-old African American woman and resident of Washington County, Oregon.  Third Am. Compl. ¶ 2, ECF 19.  She alleges that her white neighbor, Kenneth McConnell Jr. ("Mr. McConnell"), frequently brought his dog over to her lawn and had the dog relieve itself there.  *Id.* ¶ 7.  Plaintiff notes that despite her repeated pleas, Mr. McConnell continued to bring his dog over to her lawn, and verbally harassed her when she noticed.  *Id.*

On May 22, 2019, Mr. McConnell and his adult daughter, Brittany McConnell ("Ms. McConnell") brought the dog to plaintiff's lawn.  *Id.* ¶ 8.  When plaintiff asked them to leave, Mr. McConnell retorted with a variety of curse words and a racial slur often used to denigrate African American persons.  *Id.*  Plaintiff pointed at the dog with her walking stick and gestured for the McConnells to leave.  *Id.* ¶ 9.  Ms. McConnell screamed, warning plaintiff to not strike the dog, and then wrestled the walking stick away and tossed it into the street.  *Id.*  Plaintiff maintains that she did not intend to or attempt to strike the dog, and, in any event, was physically incapable of doing so.  *Id.*

Plaintiff reported the incident to the Hillsboro Police Department ("HPD"), prompting Officer Schoeffler, a white HPD officer, to investigate. *Id.* ¶ 10. In a preliminary interview, plaintiff recounted the incident, clarified that she did not initiate the assault, displayed her arm injuries, and noted that Mr. McConnell had previously harassed her. *Id.* ¶ 11-12. According to plaintiff, Officer Schoeffler responded in a condescending manner, mentioning that "we used to deal with the same issue" at plaintiff's prior residence because "[plaintiff] complained about every single neighbor she had." *Id.*

Officer Schoeffler then interviewed the McConnells together in their home. *Id.* ¶ 13. Mr. McConnell admitted that he had previously harassed plaintiff, and Ms. McConnell admitted that she grabbed plaintiff's walking stick and tossed it into the street. *Id.* However, the McConnells insisted that plaintiff had initiated the incident. *Id.* ¶ 15. Plaintiff alleges that throughout the interview, which was recorded by a body camera, Officer Schoeffler "remained respectful and sympathetic" to the McConnells and "reassured [them] he was not going to take the matter seriously and that he did not believe [plaintiff] because she was mentally ill." *Id.* ¶ 14. After assuring the McConnells that he would forward the matter to HPD's mental health team, Officer Schoeffler suggested that should any future incidents arise, they "just call [HPD], and we'll deal with it. Your tax dollars pay for us to deal with problems so you don't have to." *Id.*

Officer Schoeffler thereafter updated plaintiff on the investigation. *Id.* ¶ 16. When plaintiff expressed concern about Officer Schoeffler speaking to the McConnells about matters unrelated to the incident, Officer Schoeffler replied that "[he didn't] know why [she] constantly [has] problems with everywhere [she went] with [her] neighbors" and "when [she] lived at [previous residence], [HPD officers] were at [her] house at least once a week." *Id.* When plaintiff suggested she had a right to request that people not have their dogs relieve themselves

on her lawn, Officer Schoeffler responded, "[I]t's like, constantly, constantly always you, always with your neighbors." *Id.* Additionally, Officer Schoeffler mentioned complaints raised by previous neighbors about plaintiff, which plaintiff maintains are irrelevant to the incident at hand. *Id.* Dissatisfied with Officer Schoeffler's actions, plaintiff agreed to have a police sergeant speak with her about the matter. *Id.* ¶ 16.

Soon after, defendant Chrz, a white HPD sergeant, arrived on scene and discussed the matter with Officer Schoeffler. *Id.* ¶ 17. The two disabled the audio on their body cameras during their conversation. *Id.* Defendants Schoeffler and Chrz then went to interview two of plaintiff's white neighbors, Brooklyn and Robert Bryant (the Bryants), even though they had not witnessed the incident. *Id.* ¶ 18. During their interview, the Bryants complained that plaintiff was a renter, and told defendants Schoeffler and Chrz that "they had an attorney but the landlord would not evict her until there's a police report." *Id.* Later, Sergeant Chrz explained to the Bryants that unless there was an ongoing investigation, every police report became public record, and the "only way . . . the landlord is going to get [plaintiff] out of here is if you guys have . . . the attorney, write a letter." *Id.* ¶ 19. Sergeant Chrz also instructed the Bryants on how to request police records, provided them with plaintiff's address, and assured them that Officer Schoeffler would give them plaintiff's last name to access any pertinent records. *Id.*

Sergeant Chrz then returned to speak with plaintiff. Plaintiff detailed the incident and expressed her concern that Sergeant Chrz had provided the Bryants with information on how to access police reports. *Id.* ¶ 22. Sergeant Chrz replied that police reports were public records and that the information contained within them was therefore "not personal information." *Id.* (internal quotation removed). Plaintiff indicated her frustration with the investigation, noting that both Officer Schoeffler and Sergeant Chrz implied she lacked credibility by mentioning to

interviewees that they "knew [plaintiff] very well." *Id.* ¶ 23.  The conversation ended shortly thereafter, and Officer Schoeffler and Sergeant Chrz left to discuss the investigation, though there exists no body camera footage of this interaction.  *Id.* ¶ 25.

A few days later, Officer Schoeffler issued a police report that concluded plaintiff "exaggerated her interactions with her neighbors and their dog" and the assault was fabricated. *Id.* ¶ 26.  Plaintiff alleges the report omitted crucial information about the incident, including Mr. McConnell's history of harassment and Ms. McConnell's admission that she tossed the walking stick into the street.  *Id.* ¶ 27.  Additionally, plaintiff notes that the report unnecessarily emphasized "negative statements . . . [Officer Schoeffler] had solicited from every witness and suspect."  *Id.* ¶ 26.

Plaintiff, dissatisfied with Officer Schoeffler's report, arranged a meeting with HPD Commander Scott Hewetson to review the matter.  *Id.* ¶ 29.  On June 20, 2019, a day before the meeting, Officer Schoeffler supplemented his initial report with a certification that "there was no body camera footage" related to the incident, even though his body camera was on at all times beyond private conversations with Sergeant Chrz.  *Id.* ¶ 30.  On June 26, 2019, five days after their meeting, Commander Hewetson informed plaintiff that he had reviewed all available body camera footage and believed Officer Schoeffler's account was accurate and satisfactory.  *Id.* ¶ 32.

Plaintiff claims that, ultimately, she was evicted by her landlord "as a result of Schoeffler's sham police report."  *Id.* ¶ 28.  Plaintiff filed suit in state court on May 21, 2020. Nweze Decl., Ex. 2 at 1, ECF 2-2.  On January 22, 2021, plaintiff filed a Second Amended Complaint, which included, among other additions, a federal claim under 42 U.S.C. § 1983. Nweze Decl., Ex. 1 at 1, ECF 2-1.  On January 29, 2021, defendants removed the case to this

court.  ECF 1.  Plaintiff filed a Third Amended Complaint on July 2, 2021, ECF 19, and

defendants' motion to dismiss for failure to state a claim followed.  ECF 22.  While evaluating

defendant's motion, the court requested two rounds of supplemental briefing related to plaintiff's

Section 1983 claim and state law negligence claim.  *See* ECF 42, 50 (plaintiff's supplemental

briefing); ECF 45, 51 (defendants' responses to plaintiff's supplemental briefing).  The court

also provided the parties with draft findings and recommendations to assist them in

understanding the court's questions.  *See* ECF 38.

## II.   Legal Standard

To state a claim for relief, a pleading must contain "a short and plain statement of the

claim showing that the pleader is entitled to relief."  FED. R. CIV. P. 8(a)(2).  This standard "does

not require 'detailed factual allegations,'" but does demand "more than an unadorned, the-

defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  "A pleading that offers 'labels

and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  *Id.*

(quoting *Twombly*, 550 U.S. at 555).

A Rule 12(b)(6) motion tests whether there is a cognizable legal theory or sufficient facts

to support a cognizable legal theory.  *Taylor v. Yee*, 780 F.3d 928, 935 (9th Cir. 2015).  To

survive a Rule 12(b)(6) motion, "the complaint must allege 'enough facts to state a claim to

relief that is plausible on its face.'"  *Id.* (quoting *Twombly*, 550 U.S. at 570).  In evaluating a

motion to dismiss, the court must accept all well-pleaded material facts alleged in the complaint

as true and construe them in the light most favorable to the non-moving party.  *Wilson v.*

*Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012).

### III.    Fourth Claim: Federal Section 1983 Claims

In her Fourth Claim, plaintiff alleges three Fourteenth Amendment claims related to a state-created danger.  Her first two claims allege that the respective actions of Officer Schoeffler and Sergeant Chrz, performed under color of state law, led to her eviction in violation of her liberty and due process interests.  Third Am. Compl. ¶¶ 62-76, ECF 19.  Plaintiff also alleges that the City, through the actions of Commander Hewetson, ratified the officers' conduct, exposing her to an "increased risk of being assaulted again" by her neighbors and "loss of her stable housing."  *Id.* ¶¶ 77-80.  While each defendant is implicated through different actions, plaintiff's claims are best analyzed in two parts: first, allegations related to an increased likelihood of harm from her neighbors, and second, claim associated with her alleged eviction.

### A.    Legal Framework

Section 1983 provides a cause of action for the deprivation of any rights, privileges, or immunities secured by the Constitution and laws of the United States.  To state a claim under § 1983, a plaintiff must allege two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under color of state law.  *Long v. Cty. Of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006).

A municipality can be held liable as a "person" under § 1983 in certain circumstances. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978).  First, a local government may be liable when the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflict[s] the injury."  *Rodriguez v. City of Los Angeles*, 891 F.3d 776, 802 (9th Cir. 2018) (quoting *Monell*, 436 U.S. at 694).  Second, a municipality can fail to train an employee in a manner that amounts

to "deliberate indifference" to a constitutional right. *Id.* Finally, a local government can be held liable if "the individual who committed the constitutional tort was an official with final policy-making authority or such an official ratified a subordinate's unconstitutional decision or action and the basis for it." *Id.* at 802-03 (quoting *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1097 (9th Cir. 2013)).

Generally, the Due Process Clause does not "impose a duty on the state to protect individuals from third parties." *Morgan v. Gonzales*, 495 F.3d 1084, 1093 (9th Cir. 2007). There exist two exceptions to this rule: (1) the special relationship exception, where a relationship between the plaintiff and the state creates a constitutional duty to protect, and (2) the state-created danger exception, "where the state affirmatively places the plaintiff in danger by acting with deliberate indifference to a known or obvious danger." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 198-202 (1989); *L.W. v. Grubbs*, 92 F.3d 894, 900 (9th Cir. 1996).[1] While Ninth Circuit caselaw on the state-created danger exception "is somewhat scattershot," *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 974 (9th Cir. 2011), there are generally two requirements: (1) affirmative actions by defendant(s) that placed plaintiff "in danger that she otherwise would not have faced," and (2) that danger "was known or obvious, and whether [defendants] acted with deliberate indifference to it." *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1062-64 (9th Cir. 2006).

### B.    Claim of Increased Likelihood of Harm from Neighbors

Plaintiff alleges that defendants' actions "subjected her to increased risk of harm of being assaulted and racially harassed again" by her neighbors. Third Am. Compl. ¶¶ 69, 75, 79, ECF

---

[1] Plaintiff does not allege that the instant case falls within the "special relationship" exception, but even if she did, such a claim would fail for reasons discussed below.

19.  Defendants seek dismissal of these claims based on plaintiff's failure to allege she was "directly and foreseeably injured by a third party."  Mot. 15, ECF 22.

Crucially, the state-created danger exception "only applies in situations where the plaintiff was directly harmed by a third party."  *Henry A. v. Willden*, 678 F.3d 991, 1002 (9th Cir. 2012) (emphasis omitted); *see also* David Pruessner, *The Forgotten Foundation of State-Created Danger Claims*, 20 REV. LIT. 357, 357 (2001) ("The theory of recovery is used against state actors, such as police, when the actor indirectly harms people by creating a *danger that ultimately injures them*.") (original emphasis removed, emphasis added).  This principle is also supported by the second element for a state-created danger claim: plaintiffs cannot demonstrate that "the suffered injury was foreseeable" unless they suffered an actual injury.  *Martinez,* 943 F.3d at 1271.  "An increased risk of harm" is not an actual suffered injury, and the absence of such proves fatal to plaintiff's claims.

The authority plaintiff provides in response does not dislodge *Willden*'s principle.  She cites *Pozos Leon v. Tillamook Cty. Sch. Dist.*, No. 3:17-cv-440-PK, 2018 WL 2175949, at *3 (D. Or. May 11, 2018), and argues that an actual physical injury" was not part of the court's analysis there.  But the facts and law discussed in *Pozos Leon* support a requirement of actual injury: both plaintiffs suffered actual physical injury that stemmed from the defendants' conduct, and the court described an element as an "affirmative act must have exposed the plaintiff to an actual, particularized danger *and the resulting harm must have been foreseeable.*"  *Id.* at 3, 10 (emphasis added).

Plaintiff also analogizes her argument to caselaw interpreting the Prison Litigation Reform Act (PLRA).  Specifically, plaintiff highlights that while the PLRA "includes a specific physical injury requirement in order to recover emotional distress damages, . . . courts are clear

that an absence of physical injury is . . . not a bar to a constitutional claim." Opp. 23, ECF 24. Analogies to the PLRA, a completely different statutory scheme, lend no weight toward how the court should evaluate elements for § 1983 claims, especially when the Ninth Circuit has already made clear what those pleading requirements are. In sum, because plaintiff's injuries did not result in actual harm, her claims associated with an increased likelihood of harassment from her neighbors fail.

### C.    Eviction-Related Claim

Plaintiff also posits that defendants' actions, which allegedly led to her eviction, deprived her of her right to "adequate housing." Third Am. Compl. ¶ 64, ECF 19. Plaintiff claims that such a right is "recognized by international law" via the Universal Declaration of Human Rights, and that the importance of housing is acknowledged in various federal and state laws. *Id.*

However, as defendants correctly observe, a property interest must be grounded in state or federal law. *See Board of Regents v. Roth*, 408 U.S. 564 (1972) ("Property interests . . . are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."). Thus, the Universal Declaration of Human Rights, which is an international covenant, does not confer a cognizable property interest for plaintiff to base a § 1983 claim upon.

In her second supplemental brief, plaintiff clarified that the argument surrounding her eviction is a substantive due process claim related to being placed "in danger she would not otherwise have faced." Pl. Second Supp. Br. 1, ECF 50 (citing *Kennedy*, 439 F.3d at 1062). Plaintiff has sufficiently offered facts to survive a motion to dismiss on this claim. She has properly alleged that defendants' affirmative actions—which included omitting and

mischaracterizing key facts about her incident in a subsequent police report—made it more likely that she would experience an "eviction, which is the forcible dispossession of access to shelter, a basic human need."  Opp. 19, ECF 24.[2]  Second, she has offered facts suggesting that defendants knew of the possible consequence of an erroneous police report—her eviction—and facilitated that outcome by providing plaintiff's neighbors with information on how to access that report "to get [plaintiff] out of here."  Third Am. Compl. ¶ 19, ECF 19.

The remaining consideration under *Kennedy* is whether defendants are entitled to qualified immunity.  As plaintiff correctly contends, defendant City, as a municipality, is not entitled to qualified immunity.  *See* Pl. Second Supp. Br. 3, ECF 50 (citing *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 166 (1993) (recognizing that "unlike various government officials, municipalities do not enjoy immunity from suit—either absolute or qualified—under § 1983").  And as for the individual defendants, plaintiff must demonstrate (1) the facts establish a violation of a constitutional right and (2) that right was "clearly established" at the time of the incident.  She has done so here: (1) the facts, when construed in plaintiff's favor, support a constitutional violation related to state-created danger, and (2) that right was clearly established "by September 1998"—well before the events that led to this lawsuit.  *Kennedy*, 439 F.3d at 1066.  Thus, plaintiff has pled a cognizable § 1983 claim involving a state-created danger that led to her eviction.

Defendants argue that an eviction does not "constitute physical injury for purposes of a state created danger claim."  Def. Second Supp. Br. 3 n.4, ECF 51.  But this assertion conflates

---

[2] Importantly, *Kennedy* and related state-created danger cases do not offer a definition of what a "danger" is, but require that any alleged danger be "actual" and "particularized."  439 F.3d at 1063.  That said, defendants do not contest that a threat of eviction constitutes danger; they instead allege that an eviction does not "constitute physical injury for purposes of a state created danger claim."  Def. Second Supp. Br. 3 n.4, ECF 51.

requirements associated with Oregon's physical impact rule (which generally requires a physical injury to support emotional distress damages) and those required for a state-created danger claim brought under § 1983.  The core question under a state-created claim is whether plaintiff suffered an actual injury—not necessarily one that is physical.  *See Willden*, 678 F.3d at 1002.  And while the Ninth Circuit has not directly found that a threat of eviction constitutes an actual injury in the context of a state-created danger claim, it (along with two other circuits) *has* found that it constitutes an actual injury in the *standing* context.  *See Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442, 446-47 (9th Cir. 1994) (finding that a threat of eviction is a "concrete and personal" danger sufficient to comprise injury in fact); *Richmond Tenants Org., Inc. v. Kemp*, 956 F.2d 1300, 1305-06 (4th Cir. 1992) (holding that a threat of eviction was sufficient to confer standing because there was a realistic danger that the plaintiffs would suffer actual injury); *Wells v. Willow Lake Ests., Inc*., 390 F. App'x 956, 959 (11th Cir. 2010) (finding that being implicated in a pending eviction proceeding was an "actual or imminent" injury that conferred standing).  In sum, plaintiff's claims associated with eviction-related injuries are cognizable under a state-created danger theory.

## IV.    First Claim:  OPAA Race-Based Discrimination Claim

Next, plaintiff alleges that the City, through the actions of HPD officers, violated O.R.S. 659A.403, the Oregon Public Accommodations Act ("OPAA"), which prohibits public accommodations from engaging in race-based discrimination.  Third Am. Compl. ¶¶ 36-40, ECF 19.  Defendants seek dismissal on two grounds: first, that police investigations do not qualify as a "public accommodation" or "service," and second, that the allegations fail to state a claim for relief.  Mot. 2-4, ECF 22.

A.    **Legal Framework**

The OPAA forbids "any person [from] deny[ing] full and equal accommodations,

advantages, facilities and privileges of any place of public accommodation" on account of race.

O.R.S. 659A.403(3).  The OPAA defines a "place of public accommodation" as:

> (a) Any place or service offering to the public accommodations, advantages,
> facilities or privileges whether in the nature of goods, services, lodgings,
> amusements, transportation or otherwise.
> (b) Any place that is open to the public and owned or maintained by a public
> body, as defined in ORS 174.109, regardless of whether the place is commercial
> in nature.
> (c) Any service to the public that is provided by a public body, as defined in ORS
> 174.109, regardless of whether the service is commercial in nature.

O.R.S. 659A.400.

When evaluating racial discrimination claims that arise under state law, federal courts

apply the *McDonnell-Douglas* burden-shifting analysis.  *Harrington v. Airbnb, Inc.*, 348 F. Supp.

3d 1085, 1089 (D. Or. 2018).  Thus, to survive a motion to dismiss, a plaintiff must establish a

prima facie case of racial discrimination.  *Id.*  A prima facie case under O.R.S. 659A.403 has two

elements: first, that plaintiff was treated unequally because of her race, and second, that she was

injured as a result.  *Id.* (citing *Allen v. U.S. Bancorp*, 264 F. Supp. 2d 945, 954 (D. Or. 2003)).

Direct evidence of racial discrimination is not required; circumstantial evidence of

discriminatory intent will suffice.  *Id.* (citing *Lindsey v. SLT Los Angeles, LLC*, 447 F.3d 1138,

1140-41 (9th Cir. 2006)).

B.    **Analysis**

Defendants argue that "police investigations" are not "public accommodations" under the

OPAA because (1) there is no Oregon case law that applies the OPAA toward police

investigations, and (2) police investigations are generally "discretionary functions, not a service

to which the public is entitled."  Mot. 3, ECF 22.

Although Oregon courts have not directly ruled on this matter, defendants' concern is easily resolved by analyzing the statute's text. The OPAA offers definitions of "public accommodation[s]" in multiple contexts, including "a place that is open to the public and owned or maintained by a public body" and "any service to the public that is provided by a public body." O.R.S. 659A.400. The HPD is an agency within the City of Hillsboro, which qualifies as "public body" under Oregon law. *See* O.R.S. 174.109.[3] Thus, the facilities and services that the HPD provides are considered places of public accommodation, and the OPAA's anti-discrimination protections apply with equal weight.

Defendants also suggest that HPD's investigations are not "services" because of their discretionary nature. Mot. 3-4, ECF 22. The OPAA does not define "service," so the court must "assume, at least at first, its 'plain, natural, and ordinary' meaning." *Smith v. Cent. Point Pawn, LLC*, 296 Or. App. 341, 345 (2019) (quoting *DCBS v. Muliro*, 359 Or. 736, 745-46 (2016)). "Service" is defined as a "contribution to the welfare of others"; it is not a guarantee of assistance to those who seek it, nor does it obligate the offeror to provide support to everyone.[4] *See Service*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/service (last visited Dec. 21, 2021). A public agency cannot exempt itself from the OPAA's anti-discrimination protections simply because the services it offers are not guaranteed to every single person. In sum, the HPD's investigations are subject to the OPAA's protections.

---

[3] O.R.S. 174.109 provides that, "as used in the statutes of this state, 'public body' means state government bodies, local government bodies and special government bodies."

[4] For example, a legal aid office offers legal assistance to the public, but is not obliged to provide services to everyone who seeks help. Indeed, a legal aid office must exercise discretion to determine how best to use its resources. That discretion has no bearing on its ability to offer services to the public. The HPD's police investigations qualify as services under a similar analysis.

Next, defendants argue that plaintiff's claims do not sufficiently allege discriminatory intent on the basis of her race. Mot. 5, ECF 22. Specifically, they claim that the primary thrust of plaintiff's allegations relate to "defendants' perception of plaintiff's mental illness," and that the "only facts regarding race" involve statements from plaintiff's neighbors. *Id.*

While direct evidence of a racially discriminatory motive may be sufficient to state a claim for intentional discrimination, circumstantial evidence may also create a reasonable inference of discriminatory motive. *Harrington*, 348 F. Supp. 3d at 1089 (citing *Lindsey*, 447 F.3d at 1140-41). Here, viewing all the facts in the light most favorable to plaintiff, it is not implausible for a factfinder to infer intentional discrimination from the defendants' actions and omissions. In particular, Officer Schoeffler omitted Mr. McConnell's admissions of racist harassment from his police report, told plaintiff that she was responsible for her own assault, and concluded in his report that plaintiff fabricated her own assault despite hearing an admission from Ms. McConnell that she seized plaintiff's walking stick and tossed it into the street. Third Am. Compl. ¶¶ 16, 26-27, ECF 19. These alleged facts plausibly invoke a discriminatory motive based in invidious racial stereotypes about African-Americans—specifically, that they are untrustworthy or that race-based harassment against them is inconsequential.

Moreover, plaintiff sufficiently alleges that during the investigation, Officer Schoeffler and Sergeant Chrz addressed her in a condescending and dismissive manner—a stark contrast to the warm commentary and advice provided to plaintiff's non-African American neighbors. Third. Am. Compl. ¶¶ 11-14, 16, 20, 22. While the allegations may also, as defendants suggest, imply discrimination on the basis of a perceived mental disability, plaintiff has met the minimum to state a prima facie case for race-based discrimination. Mot. 5, ECF 22.

V.     **Second Claim:  OPAA Disability-Based Discrimination**

Plaintiff next alleges that defendant City, through the actions and conduct of HPD officers, violated O.R.S. 659A.142(4)-(5)), which prohibit discrimination against persons with disabilities.  Third Am. Compl. ¶¶ 41-46, ECF 19.  Defendants seek dismissal of this claim on three grounds: first, that police investigations do not qualify as "public accommodations," second, that O.R.S. 659A.142(5) does not apply to defendant City, and third, that plaintiff has failed to specify enough details about her purported disability.  Mot. 2-9, ECF 22.

A.     **Legal Framework**

Oregon law forbids "any place of public accommodation, . . . or any person acting on behalf of such place" from "mak[ing] any distinction, discrimination, or restriction because a customer or patron is an individual with a disability."  O.R.S. 659A.142(4).  Similarly, state entities may not "exclude an individual from participation in or deny an individual the benefits of the services, programs or activities of state government or to make any distinction, discrimination or restriction because the individual has a disability."  O.R.S. 659A.142(5)(a).

Both statutes must be construed in a manner consistent with the federal Americans with Disabilities Act (ADA).  *See* O.R.S. 659A.139(1) ("ORS 659A.103 to 659A.144 shall be construed to the extent possible in a manner that is consistent with any similar provisions of the federal Americans with Disabilities Act of 1990") (internal footnote omitted).

B.     **O.R.S. 659A.142(4)**

Defendant again alleges that police investigations are not public accommodations, and thus do not fall within the purview of § 659A.142(4).  Mot. 3, ECF 22.  This argument fails for two reasons.  First, as detailed above, Oregon's public accommodations statutes apply to both the

facilities and services that a public body offers, and the HPD's investigations, regardless of their discretionary nature, are a service provided to the public.[5]

Second, and unique among the OPAA's anti-discrimination protections, O.R.S. 659A.142(4) must be construed in a manner consistent with the federal ADA when possible. *See* O.R.S. 659A.139(1).[6]  The ADA applies to all "services, programs, and activities of a public entity," and the Ninth Circuit has interpreted the phrase to encompass "anything a public entity does." *Barden v. City of Sacramento*, 292 F.3d 1073, 1076 (9th Cir. 2002) (quoting *Lee v. City of Los Angeles*, 250 F.3d 668, 691 (9th Cir. 2001)) (internal quotation marks omitted).  The HPD is a public entity, and thus, police investigations conducted by on-duty HPD officers necessarily fall under the ADA.  *See Sheehan v. City & Cty. of San Francisco*, 743 F.3d 1211, 1232 (9th Cir. 2014), *rev'd in part, cert. dismissed in part sub nom. City & Cty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600 (2015) (holding that "[t]he ADA applies broadly to police services, programs, or activities") (internal quotation marks omitted).[7]

---

[5] While the court agrees with plaintiff that the OPAA applies to police investigations, it does not endorse plaintiff's argument that the Hillsboro Police Department's mission statement is an alternative means for conferring statutory authority.  *See* Opp. 7, ECF 24.

[6] To be clear, "ORS 659A.139 does not require absolute symmetry between our statutory protections for individuals with disabilities and those afforded by the ADA." *Fenimore v. Blachly-Lane Cty. C.E.A.*, 297 Or. App. 47, 56 (2019).  "To the extent that a particular provision of our statutory scheme *cannot* be construed consistently with similar provisions in the ADA, we do not look to the ADA and case law interpreting it to determine the meaning or scope of our laws." *Id.* (emphasis in original).  In this case, the federal ADA and the OPAA are not in conflict: services are part of "anything a public entity does," and in any event, there is an independent justification rooted in state law for finding that the HPD's investigations are subject to anti-discrimination laws.

[7] Defendant argues: (1) *Sheehan* only applies the ADA to scenarios involving (a) wrongful arrest and (b) a failure to accommodate a plaintiff who has been both investigated and arrested; and (2) that the Supreme Court has not endorsed the Ninth Circuit's interpretation.  Reply 3, ECF 25. However, *Sheehan* did not *confine* the application of the ADA in the policing context to only

Next, defendant seeks dismissal of this claim because plaintiff fails to plead that she is a "customer or patron" of the HPD, which is a required element of the statute. Mot. 7, ECF 22; *see* O.R.S. 659A.142(4) ("It is an unlawful practice for any place of public accommodation . . . to make any distinction, discrimination or restriction because a *customer or patron* is an individual with a disability.") (emphasis added). Although plaintiff insists that specificity is unnecessary because the statute expressly "prohibits disability discrimination in public accommodations," she adds that she is willing to amend her complaint to allege she is a patron or customer. Opp. 15, ECF 24.

While the OPAA prohibits disability-based discrimination in public accommodations, the specific sub-section under which plaintiff seeks relief explicitly requires plaintiff to be a "customer or patron" of the public accommodation. O.R.S. 659A.142(4). Contrary to defendants' assertion, plaintiff would qualify as a patron of the HPD, because a patron is "one who buys the goods or uses the services offered, especially by an establishment." *See* Reply 7, ECF 25; *Patron*, Merriam-Webster, https://www.merriam-webster.com/dictionary/patron (last visited Dec. 19, 2021). In calling the HPD's non-emergency line for support, plaintiff used the HPD's services, making her a patron. Third Am. Compl. ¶ 10, ECF 19. Plaintiff's failure to allege she is a patron can be corrected via an amended complaint. Amendment would not be futile, and plaintiff should be granted leave to amend to add this essential element.

---

certain arrests; it simply stated that courts have identified "at least two types of [ADA] claims applicable to arrests." *Sheehan*, 743 F.3d at 1232. Furthermore, the Supreme Court took no position on the Ninth Circuit's interpretation of the ADA toward arrests because it *dismissed* the writ of certiorari on that question as improvidently granted. *See City & Cty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600, 610 (2015).

Finally, defendant seeks dismissal of plaintiff's disability-based discrimination claims because she failed to specify that "defendants believed and treated plaintiff as if [her mental issues] substantially limited one or more of [her] life activities." Reply 5, ECF 25. O.R.S. 659A.104 clarifies that under the OPAA, a person is considered disabled if:

> (c) The individual is regarded as having a physical or mental impairment that substantially limits one or more major life activities of the individual. For the purposes of this paragraph:
>> (A) An individual is regarded as having a physical or mental impairment if the individual has been subjected to an action prohibited under ORS 659A.112 to 659A.139 because of an actual or perceived physical or mental impairment, whether or not the impairment limits or is perceived to limit a major life activity of the individual.

O.R.S. 659A.104.

Here, plaintiff alleges that Officer Schoeffler believed she was mentally ill and had a disability that made her unable to control her actions or temper—for example, by "constantly hav[ing] problems with everywhere [she] go[es] with [her] neighbors," having "lots and lots of [police] calls" at her prior residence, or "pretending to film" her neighbors. Third Am. Compl. ¶¶ 14, 16, ECF 19. Plaintiff also alleges that defendants failed to take her complaints seriously due to her perceived "mental issues." *Id*. ¶ 42. Thus, plaintiff sufficiently alleges that defendants perceived she had a disability and her complaints were not taken seriously as a result of the perceived disability. So long as plaintiff amends her complaint to allege that she was a patron or customer of HPD's services, her allegations are sufficient to survive defendant's motion to dismiss.

## C.    O.R.S. 659A.142(5)

Plaintiff alternatively seeks relief under O.R.S. 659A.142(5), which bars "state government [from] exclud[ing] an individual from participation in or deny[ing] an individual the benefits of the services, programs or activities of state government or to make any distinction,

discrimination or restriction because the individual has a disability." Third Am. Compl. ¶¶ 41-46, ECF 19. Defendants seek dismissal of this claim, arguing that defendant City and the HPD do not qualify as "services, programs, or activities of state government." Mot. 7, ECF 22.

While plaintiff is correct in alleging that municipalities are generally considered instrumentalities of state government, *see City of Hillsboro v. Pub. Serv. Comm'n of Oregon*, 97 Or. 320, 337 (1920), the statute expressly defines "state government" as "the executive department, the judicial department and the legislative department." O.R.S. 659A.142(1)(e), O.R.S. 174.111. Defendant City is not an agency within any of those three departments, and so relief under O.R.S. 659A.142(5) is unavailable to plaintiff.

Perhaps in recognition of this problem, plaintiff offers to amend her complaint to add a cause of action under Hillsboro Municipal Code 7.28.060, which effectively is an anti-discrimination statute and incorporates O.R.S. 659A.142(5) within its text. *See* Opp. 16, ECF 24. Defendants argue such an amendment would be futile because the municipal code is "expressly grounded in the provisions" of the state statute. Reply 8, ECF 25.

Importantly, the cited provisions of the Hillsboro Municipal Code extend the OPAA's protections *beyond* state government actors; each provision makes it unlawful for *any entity* to discriminate in public accommodations and adds additional protected classes on top of the state's definitions. *See, e.g.*, Hillsboro Mun. Code 7.28.040 (making discrimination in public accommodations against any of the OPAA's protected classes unlawful, as well as additional listed protected classes). That broad sweep places the HPD within the purview of anti-discrimination statutes listed in the Hillsboro Municipal Code. As discussed earlier, plaintiff has properly alleged that police services qualify as a public accommodation under the OPAA, and the Hillsboro Municipal Code incorporates the OPAA's protections. Thus, plaintiff's

proposed amendment would not be futile, and leave to amend should be granted.

## VI.    Third Claim: State Law Negligence Claims

Lastly, plaintiff alleges two common law negligence claims against defendant City.  First, she argues that HPD officers violated "HPD policy" surrounding hate crime investigations and antidiscrimination practices, and that such violations led to her eventual eviction.  Third Am. Compl. ¶¶ 47-57, ECF 19.  Second, she alleges that defendant City failed to "adequately train and . . . discipline officers" to meet these internal policies, and that this lack of training and discipline also led to her eventual eviction.  *Id.* ¶¶ 58-61.

Defendants seek dismissal of the common law negligence claims on four separate grounds.  First, defendants argue that "a claim for negligent police investigation does not exist in Oregon."  Mot. 8, ECF 22.  Second, they posit that internal departmental polices, such as HPD's, do not establish a duty of care for members of the public.  *Id.* at 9.  Third, they allege that they are entitled to the absolute privilege in publishing defamatory statements.  *Id.* at 13.  Finally, they claim that plaintiff has failed to sufficiently plead required elements of a negligence claim, including causation and damages.  *Id.* at 10-13.

As discussed below, plaintiff's negligence claim fails for a number of reasons.

### A.    Legal Framework

Under common law, the elements of negligence required a plaintiff to prove that the "defendant owed the plaintiff a duty, that the defendant breached that duty, and that the breach was the cause-in-fact of some legally cognizable damage to the plaintiff."  *Brennen v. City of Eugene*, 285 Or. 401, 405 (1979).  However, under Oregon's "contemporary jurisprudence, the traditional duty-breach analysis is subsumed in the concept of general foreseeability 'unless the parties invoke a status, a relationship, or a particular standard of conduct that creates, defines, or

limits the defendant's duty.'" *Chapman v. Mayfield*, 358 Or. 196, 205 (2015) (quoting *Fazzolari v. Portland School Dist. No. 1J*, 303 Or. 1, 17 (1987)) (footnote and citation omitted). Nonetheless, "causation-in-fact and the occurrence of legally cognizable harm (damage) remain as elements of any common-law negligence claim." *Id*. (citing *Oregon Steel Mills, Inc. v. Coopers & Lybrand, LLP*, 336 Or. 329 (2004)).

### B.    Cognizable Causes of Action and Immunities

Defendants first contend that claims of "negligent police investigation" are not recognized under Oregon law.  They assert that they were unable to "find any Oregon court recognizing such claim against police officers for common law negligence based on a negligent investigation failing to lead to an arrest."  Mot. 8, ECF 22.  However, a failure to find an on-point case does not necessarily mean that Oregon law bars such claims altogether.  Indeed, a search reveals some Oregon cases where courts have entertained and evaluated common-law negligence claims against law enforcement officials.

For example, in *McAlpine v. Multnomah Cty.,* an automobile passenger brought common-law negligence, negligence *per se*, and statutory liability claims against the City of Portland and a regional narcotics agency.  131 Or. App. 136, 138-41 (1994).  The plaintiff theorized that his injuries, inflicted from a car accident with a parolee, would not have occurred had the defendants properly investigated and arrested the parolee prior to the accident.  *Id.*  The Oregon Court of Appeals upheld the trial court's dismissal of the common-law negligence claim, but on fact-specific grounds—i.e., because the plaintiff had failed to demonstrate a special relationship between the parties or that the injury was foreseeable.  *Id.* at 141-44.  The corollary is that while

claims of negligent police investigation may be uncommon, they remain cognizable under Oregon law; put differently, there is no absolute bar to claims for negligent police investigation.[8]

Defendants also allege they are entitled to the absolute privilege to publish defamatory statements while performing official duties. Mot. 13, ECF 22. It is true that "inferior state officers[,] no matter how low their rank or standing[,]" are entitled to absolute immunity while publishing "statements in the course of their official duties." *Shearer v. Lambert*, 274 Or. 449, 452-53 (1976). However, plaintiff's allegations are not isolated to missing words within a police report or comments made by HPD officers; they involve claims of negligence surrounding defendants' *conduct* and *actions*, which are beyond the scope of defamation-related protections. *See generally* Third Am. Compl., ECF 19. While defendants suggest that absolute immunity "ought to apply with equal weight" to this negligence claim, Mot. 13, ECF 22, "this is an area of tort liability" where courts "defer to the legislature for appropriate action." *Shearer*, 274 Or. at 453.

### C.    Duties and Special Relationships

Under Oregon law, the analysis of a negligence claim begins by evaluating the existence of "a status, relationship, or particular conduct that creates, defines or limits the defendant's duty." *Fazzolari*, 303 Or. at 19. Plaintiff offers two articulations: first, that internal HPD policies create a duty for officers to comply with, and second, that law enforcement officers, by

---

[8] The ultimate disposition of *McAlpine* may assuage defendants' concern that recognizing such claims would "open the floodgates to litigation from law enforcement and agencies." Mot. 8, ECF 22. While such claims are not *barred* by Oregon law, they can be summarily resolved at other points in the negligence analysis, such as issues of causation, foreseeability, and damages. Defendants' additional argument that negligence claims against police agencies are "inherently grounded in speculation" further this point, as plaintiffs who fail to provide evidence for their claims will have their claims dismissed. *Id.* at 9.

virtue of their profession, owe a "special responsibility" to the public.  Third Am. Compl. ¶¶ 48-

50, 57-58, ECF 19; Opp. 19, ECF 24.

However, there exists no precedent in Oregon law that internal department policies create

a duty of care toward the general public, and the cases plaintiff provides do not support such a

theory.  For example, plaintiff offers *Est. of Ford v. Ramirez-Palmer*, but that case focused on

the interaction between qualified immunity and the Eighth Amendment's guarantee from cruel

and unusual punishment; the "negligent" term within that opinion was simply an adjective for the

prison official's conduct.  301 F.3d 1043, 1052 (9th Cir. 2002).  Similarly, plaintiff cites to the

following text from *Bellikka v. Green*:

> Even where a statutory tort is not available, a plaintiff, or a defendant, may be
> able to use a statute to meet or support one of the elements of his or her claim or
> defense in an ordinary negligence action.

306 Or. 630, 650 (1988).  However, HPD's internal department policies are not legislative

statutes or statutory mandates, and thus cannot independently support an element in plaintiff's

negligence claim.

The crux of plaintiff's argument is found in her response: "[HPD] policies *can* and *should*

establish [HPD officers'] duty and standard of care."  Opp. 18, ECF 24 (emphasis added).  But

plaintiff offers no relevant authority and little analysis to support a finding that HPD's internal

policies impose a duty of care upon officers.  Instead, courts have expressly found that such

policies do not create a duty in the negligence *per se* and statutory negligence contexts.  *See*

*Frank v. Cascade Healthcare Cmty., Inc*., No. 6:11-CV-06402-AA, 2013 WL 867387, at *9 (D.

Or. Mar. 6, 2013); *Barringer v. Clackamas Cty*., No. CV 09-068-AC, 2010 WL 5349206, at *11

(D. Or. Nov. 22, 2010), *report and recommendation adopted*, No. CIV. 09-68-AC, 2010 WL

5342965 (D. Or. Dec. 21, 2010).  Given the absence of relevant authority, and contrary findings

within analogous causes of action, the court declines to expand Oregon tort law to recognize duties created by internal department policies.

Oregon law also recognizes a duty created through a special relationship between parties, such as one between school officials and students. *See Fazzolari*, 303 Or. at 17. Plaintiff alleges that such a special relationship exists between her and HPD officers, and refers to various provisions in "the Constitution, Oregon law, and HPD policies" for justification. However, the Oregon Supreme Court primarily looks to "standards of conduct in the American Law Institute's Restatements of the Law" to establish negligence-related duties. *Park v. Hoffard*, 315 Or. 624, 629 (1993).[9] While the Restatement states that "law-enforcement officers" hold affirmative duties as "custodians," *see* Restatement (Third) of Torts: Phys. & Emot. Harm Index L90 (2012), custodians only owe a duty of care to "those in [their] custody." Restatement (Third) of Torts: Phys. & Emot. Harm § 40 (2012).

Here, plaintiff was not in custody. She is a member of the public, and law enforcement officials have "no special relationship to members of the public in general." *Buchler v. State By & Through Oregon Corr. Div.*, 316 Or. 499, 505-06 (1993) (declining to find that a correctional institution owed a duty to the public for the actions of prison escapees). Accordingly, within the context of these negligence claims, there is no special relationship nor duty owed by defendants to plaintiff.

---

[9] To be clear, Oregon courts do not adopt the Restatements wholesale, as there exists a "need to temper the Restatement rules where they are based on outmoded understandings of legal relationships." *Park*, 315 Or. at 624. However, the Restatements do serve as a strong starting point for analyzing obligations in common law, such as legal duties.

### D.    Foreseeability, Causation, and Damages

The absence of a special duty owed by defendants to plaintiff does not invalidate her

negligence claims.  Instead, the analysis proceeds to multiple elements, including general

principles of foreseeability, causation-in-fact, and the occurrence of damages, or legally

cognizable harm.  *Chapman*, 358 Or. at 205 (2015).  It is here where plaintiff's claims are

deficient, as there are issues with causation and the damages she seeks.

With respect to causation, plaintiff claims that the harms she suffered were caused by

defendant City's failure to "adequately train and . . . discipline officers."  Third Am. Compl. ¶

58, ECF 19.  Yet in her Third Amended Complaint, plaintiff offered no facts detailing that

defendant City failed to train or discipline police officers.  When prompted to address this issue

in supplemental briefing, plaintiff posited she has evidence that defendant City failed to

discipline the officers involved in this incident.  Pl. First Supp. Br. 2, ECF 42.  But even if the

court accepted this as true, it cannot find that one instance of failing to discipline officers for the

events that form the basis for plaintiff's negligence claim constitutes causation of the harm that

plaintiff experienced.

Plaintiff also alleges that defendants' failure to adhere to HPD policies led to her eventual

eviction.  Third Am. Compl. ¶¶ 47-57, ECF 19.  But the only causation-related detail in her

Third Amended Complaint is the allegation that "as a result of [defendant] Schoeffler's sham

police report, [plaintiff's] landlord evicted her from her home."  *Id.* ¶ 28, ECF 19.  After being

asked by the court to address this issue, plaintiff suggested in supplemental briefing that she

could amend her complaint to allege that her landlord "read the police report from the May 22

incident" and that her eviction was "based on the police report from the May 22 incident."  Pl.

First Supp. Br. 1, ECF 42.  Such an amendment would help plaintiff satisfy the causation

element of a negligence claim at the motion to dismiss stage, if the claim did not otherwise fail

due to lack of cognizable damages.

Plaintiff seeks emotional and economic damages based on harms related to her eviction

and an increased risk of harassment from her neighbors.  But Oregon courts adhere to the

physical impact rule, which, with three exceptions ("*Hammond* exceptions"), requires an actual

physical injury to support emotional distress damages.  *Paul v. Providence Health Sys.-Oregon,*

351 Or. 587, 597 (2012) (citing *Hammond v. Cent. Lane Commc'ns Ctr.,* 312 Or. 17, 22–23

(1991)) (noting that Oregon courts consistently reject "claims for emotional distress damages

caused by a defendant's negligence, in the absence of any physical injury.").  Thus, plaintiff must

either allege a physical injury or qualify for an exception to the physical impact rule to recover

for her emotional distress.

Plaintiff alleges that she has suffered a physical injury through her eviction, which she

describes as "the forcible dispossession of access to shelter, a basic human need."  Opp. 19, ECF

24.  However, "the physical impact rule requires an act or omission that results in some

perceptible physical effect on a plaintiff."  *Chouinard v. Health Ventures*, 179 Or. App. 507, 515

(2002).  Plaintiff does not allege that her eviction had a perceptible physical effect on her, nor

does she offer any authority that an eviction is "a physical injury that gives rise to emotional

distress."  *Id.* at 514 (quotation omitted).  Thus, plaintiff's pleadings fail to establish that she

suffered a physical injury, and she must qualify for a *Hammond* exception to recover for her

emotional distress damages.  *Paul*, 351 Or. 587.

Of the three *Hammond* exceptions, only one is applicable to plaintiff's negligence claim:

"where the defendant's conduct infringed on some legally protected interest *apart from causing*

*the claimed distress*, even when that conduct was only negligent."  *Hammond*, 312 Or. at 23

(emphasis added).[10]  Plaintiff claims that her "legally protected interest to be free from anti-Black racial discrimination should also be considered and valued."  Opp. 20, ECF 24.[11]  In her first supplemental brief, plaintiff suggests that she can amend to add an interest related to the "right to enjoy her property without reasonable interference."  Pl. First Supp. Br. 2-3, ECF 42 (citing *Macca v. Gen. Telephone Co.*, 262 Or. 414, 418 (1972).  But these suggested interests— freedom from racial discrimination and freedom from interference with the enjoyment of property—are the same harms she alleges were inflicted by defendants.

Additionally, even if plaintiff identifies a protected interest that is distinct from the harms she experienced, she can only recover for emotional distress damages "if the predicate legally protected interest is of sufficient importance as a matter of public policy to merit protections from emotional impact."  *Tomlinson*, 275 Or. App. at 682 (citing *Lockett v. Hill*, 182 Or. App. 377, 380 (2002)).  Plaintiff must allege this in order to complete her negligence claim and survive a motion to dismiss.

Finally, because plaintiff's negligence claims fail to allege physical injury or emotional distress damages, she is not entitled to economic damages.  *See Hale v. Groce,* 304 Or. 281, 283–84 (1987) ("[W]ithout a duty to plaintiff . . . plaintiff's tort claim would confront the rule

---

[10] The other *Hammond* exceptions require either an intent to inflict severe emotional distress or an intent to "do the painful act with knowledge that it will cause grave distress, when the defendant's position in relation to the plaintiff involves some responsibility aside from the tort itself."  312 Or. at 23.  Neither are applicable to plaintiff's *negligence* claim, as intentional conduct cannot support a negligence claim.

[11] Defendants, citing *Tomlinson v. Metro. Pediatrics, LLC*, also allege that plaintiff must allege a "special relationship" to state a claim for negligence when she only seeks emotional distress damages.  275 Or. 658, 682 (2015).  But a "special relationship" is just one of four available sources to establish a legally protected interest; the other three are common law, statutes, and court orders.  *Id.* at 681.  Plaintiff cites to O.R.S. 166.155 and 166.165, which are statutes that enshrine offenses for those who commit bias-related claims.

that one ordinarily is not liable for negligently causing a stranger's purely economic loss without injuring his person or property.").

### E.      Dismissal Under *Barringer*

In the District of Oregon, "a state common-law claim of negligence may be maintained separately from a § 1983 claim only when [it] is based on facts that are different from the facts on which the § 1983 claims are based." *Barringer*, 2010 WL 5349206, at *9 (citations and internal quotations omitted). Here, a review of the briefing reveals that plaintiff's negligence claims are premised on the same facts (though different conclusions) as her surviving § 1983 claim. For this reason, plaintiff's negligence claims cannot exist alongside her federal § 1983 claim, and must be dismissed for this court to retain jurisdiction over the remainder of this case.

Plaintiff objects to any application of *Barringer* on two grounds: first, she alleges it only applies in Fourth Amendment cases, not Fourteenth Amendment disputes; second, she argues claims that it is only proper on a motion for summary judgment. Pl. First Supp. Br. 4-6, ECF 42. Both of these arguments are unpersuasive. First, as defendants point out, courts in this district have applied *Barringer* to cases involving the Fourteenth Amendment. *See, e.g., Frank*, 2013 WL 867387, at *5 (applying rule to Fourteenth Amendment claim); *Saberi v. City of Portland*, No. CV 04-1396-MO, 2006 WL 2707995, at *4 (D. Or. Sept. 18, 2006) (applying rule to Fourteenth Amendment claim).

Second, while *Barringer* may be more commonly applied on a motion for summary judgment, that does not preclude its application when, even granting all reasonable inferences in plaintiff's favor, her negligence claim cannot survive as a matter of law. Thus, plaintiff's negligence claim cannot survive if she wishes for this court to retain jurisdiction; this court can

only retain jurisdiction at this moment if her § 1983 claim survives, which, under *Barringer*,
would warrant dismissal of the negligence claim.

## RECOMMENDATIONS

Defendants' motion to dismiss (ECF 22) should be GRANTED as to plaintiff's common
law negligence claims and her § 1983 claim related to injuries associated with an increased threat
of harm from her neighbors.  Defendants' motion should be DENIED as to plaintiff's race-based
discrimination claim under the OPAA and her § 1983 claim regarding eviction-related injuries
associated with a state-created danger.  Plaintiff also should be granted leave to amend her
disability-based discrimination claim under the OPAA in accordance with these Findings and
Recommendations, and defendants' motion to dismiss as to that claim should be DENIED.

## SCHEDULING ORDER

These Findings and Recommendations will be referred to a district judge.  Objections, if
any, are due Thursday, April 14, 2022.  If no objections are filed, then the Findings and
Recommendations will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a
copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings
and Recommendations will go under advisement.

## NOTICE

These Findings and Recommendations are not an order that is immediately appealable to
the Ninth Circuit Court of Appeals.  Any Notice of Appeal pursuant to Rule 4(a)(1), Federal
Rules of Appellate Procedure, should not be filed until entry of a judgment.

DATED March 31, 2022.

_____/s/ Youlee Yim You_____
Youlee Yim You
United States Magistrate Judge